**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GREENWICH TERMINALS LLC, GLOUCESTER TERMINALS LLC** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 26-4821** |
| | : | |
| **UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*** | : | |

# MEMORANDUM

**KEARNEY, J.** **November 5, 2026**

Two unions representing longshoremen ask to intervene in a case brought by two upstream Delaware River port terminals challenging the United States Army Corps of Engineers' study of navigability and safety concerns when granting a permit and authorization to Diamond State Port Corporation to construct a downstream port on the Delaware River in Edgemoor, Delaware. The unions admit they have no present contracts at risk and no present statutory right to funds from an Edgemoor, Delaware port. The unions hope their longshoremen members can work in the port. The two terminals and Army Corps agreed Diamond State Port Corporation could intervene as the applicant for the challenged permit. It is already a party in this Action. The unions have no compelling interest not already fully protected by Diamond State Port Corporation at this stage.

The unions had nothing to do with the Administrative Record before the Army Corps now subject to our review limited to the challenged issues of navigability and safety. The unions want to intervene to discuss the economic impact of a new Delaware port upon their members including hours available for new members and economic issues for ports along the Delaware River.

But the terminals do not dispute the Army Corps fully considered these economic issues. These economic issues are not before us. And our review is limited to the Army Corps' study

based on the Administrative Record. We find no basis to allow the unions to intervene to address issues on the economic benefits not at issue in this case.

## I. Facts

We begin with undisputed background to offer context. Several ports exist along the Delaware River stretching from the Delaware Bay to Philadelphia and beyond our District. Delaware, New Jersey, and Pennsylvania border this important waterway in and near our District. The Delaware River connects ports in these states to World commerce. Two terminals known as Greenwich Terminals, LLC and Gloucester Terminals, LLC operate in and around Philadelphia and South Jersey.

Congress authorized the deepening of the Delaware River Main Channel over thirty-four years ago.[1] The Deepening Project involves initial and maintenance dredging of the Delaware River Main Channel to a depth of forty-five feet. This important public work allows large cargo vessels to navigate upriver to deliver products to previously inaccessible riverside ports from the Delaware Bay to Philadelphia.

The ports saw an increased need for deeper channels after the Panamanian government completed the Panama Lock Expansion Project in 2017. Diamond State Port Corporation, a corporate entity of the state of Delaware, purchased property in Edgemoor, Delaware to (among other things) develop a new port along the Delaware River at Edgemoor, Delaware—a few miles south of the Pennsylvania/Delaware border and the Greenwich and Gloucester terminals.

Diamond State applied to the Army Corps for a permit under section 10 of the Rivers and Harbors Act of 1899 and section 404 of the Clean Water Act on March 10, 2020.[2] The Army Corps, after receiving an application, evaluates the application and then either recommends or does not recommend the local Corps District Commander grant the permit or permission sought.

Diamond State sought to develop the "new containerized cargo port" at its purchased Edgemoor site.

The Army Corps recommended the District Commander approve Diamond State's section 408 request on June 23, 2022. The Army Corps waited approximately seven weeks after issuing its section 408 recommendation before recommending the District Commander approve the section 404/10 permit on August 4, 2022.

The Army Corps' District Commander formally approved the Edgemoor Project in its 404/10 Permit and 408 Approval Package on August 4, 2022.

***The Terminals challenge the District Commander's 2023 approval.***

Greenwich Terminals LLC and Gloucester Terminals LLC sued the Army Corps, former District Commander for the Philadelphia District of the Army Corps Engineers Jeffrey Beeman, and Chief of the Regulatory Branch for the Philadelphia District of the Army Corps Todd Schaible over three years ago.[3] The Terminals challenged the Army Corps' 2022 issuance of the section 404/10 permit and section 408 authorization to construct a new port in Edgemoor, Delaware.[4] They claimed the Army "Corps failed to adequately evaluate, study, consider, and mitigate the [Edgemoor] Project's negative impacts on navigation, safety, economics, and the Delaware Deepening Project."[5]

We found in October 2024 the Army Corps arbitrarily and capriciously recommended the District Commander issue the section 404/10 permit because the Army Corps: (1) dismissed navigation concerns raised by commenters and relied on submitted traffic data and conclusions drawn from the data without attempt at independent verification; and (2) found safety concerns "not applicable" to the Edgemoor Project despite safety concerns raised by commenters.[6] But we also found the Army Corps engaged in reasoned consideration of economic impact.[7]

We vacated the 404/10 permit and expected the Army Corps to reevaluate its decision consistent with our opinion.[8]

***The Corps reevaluated and reissued the permit and authorization.***

Diamond State asked the Army Corps to reevaluate applications for a 404/10 permit and 408 authorization on December 5, 2024.[9] The Army Corps reissued the 404/10 permit and 408 authorization to Diamond State on April 10, 2026.[10]

***The Terminals sue again.***

The Terminals returned here on July 10, 2026 suing the Army Corps, District Commander for the Philadelphia District of the Army Corps Lieutenant Colonel Ryan Baum, Division Commander for the North Atlantic Division of the Army Corps Colonel Jesse Curry, and Chief Schaible.[11] The Terminals allege the Army Corps failed to properly consider navigation and safety concerns in the Delaware River when issuing permits to build the Edgemoor port.[12] The Terminals do not challenge the Army Corps' consideration of the economic impact. The issues before us on review of the administrative record relate solely to navigation and safety.

Diamond State moved to intervene without opposition.[13] We granted Diamond State leave to intervene in this Action approximately six weeks ago.[14]

## II. Analysis

International Longshoremen's Association Local 1694, Local 1883, and Local 1884 timely moved to intervene.[15] The International Longshoremen's Association moved to intervene a week later.[16] The Terminals opposed both Motions.[17] We held oral argument during our Rule 16 Conference.[18] We deny both Motions to intervene.

**A. We deny mandatory intervention.**

The Unions argue we must allow them to intervene under Rule 24(a).[19] The Terminals disagree.[20] We find the Unions do not have a sufficient interest in the litigation and, even if they did, Diamond State is fully representing the same economic interests (even though those issues are not at issue in the Terminals' challenge) under Rule 24(a).

The Supreme Court through Rule 24(a) requires us to allow a party to intervene when it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."[21] The Supreme Court requires the Unions establish: 1) a timely application for leave to intervene; 2) a sufficient interest in the litigation; 3) a threat the interest will be impaired or affected by the disposition of the action; and 4) the existing parties to the action do not adequately represent the prospective intervenor's interests.[22]

**1. The Unions timely applied for leave to intervene.**

The Local and International Longshoremen argue their Motions are timely. The Terminals do not dispute the timeliness of the Motions. We find the Motions timely.

We consider three main factors when assessing timeliness: 1) the stage of the proceeding; 2) potential prejudice to the parties caused by the delay; and 3) the reason for the delay.[23] The Unions filed their Motions before we held an initial pretrial conference.[24] There is no potential prejudice to the parties. We find no delay. The Motions are timely.

**2. The Unions do not have a sufficient interest in the litigation.**

The Local Longshoremen argues it has a sufficient interest in the work hours the Edgemoor Port would create because the hours worked affect their members' status and ability to obtain and maintain health insurance.[25] It further argues its operation of exclusive "hiring halls" where

members and non-members obtain daily employment is a sufficient interest.[26] Lastly it argues it has a strong financial interest because the Union raises its revenue through union dues which are paid through the employees' payroll.[27]

The International Longshoremen Union argues it has a sufficient interest in the litigation because "it represents the longshore workers who will earn wages and hours once the" Edgemoor Port is up and running.[28] It also argues its sufficient interest is the "overall coastwide bargaining unit" as it represents workers beyond those in the Port of Wilmington.[29] It claims the International Longshoremen "has an interest in how the Court applies the work rules established by the Master Contract and the [] local contracts in evaluating" the Terminals' allegations.[30]

The Terminals counter the Local and International Longshoremen Unions' interests are economic interests insufficient to satisfy Rule 24(a).[31] They argue the Unions' reasoning could justify intervention by all businesses or persons who expect to benefit economically from a new port which Rule 24 did not contemplate.[32] The Terminals argue the Army Corps already factored the Unions' interest in job creation into its decision-making, which we affirmed.[33] The Terminals argue the International Longshoremen's argument regarding how we apply the work rules established by the Master Contract is irrelevant to the case because the Terminals are only challenging the adequacy of the Army Corps' consideration of impacts on navigation and safety in the Delaware River.[34]

A sufficient interest in the litigation is one "specific to [the intervenor], [ ] capable of definition, and [which] will be directly affected in a substantially concrete fashion by the relief sought."[35] The Local and International Longshoremen Unions must demonstrate an interest relating to the property or transaction which is the subject of the action.[36] "A mere economic interest in the outcome of the litigation is insufficient to support a motion to intervene."[37] "[T]he

polestar for evaluating a claim for intervention is always whether the proposed intervenor's interest is direct or remote."[38]

The Local and International Longshoremen Union rely on our Court of Appeals's guidance in *Kleissler v. United States Forest Service*.[39] The facts in *Kleissler* involved an effort to enjoin logging in a national forest.[40] School districts and townships moved to intervene asserting an interest in the suit because they receive funds from receipts of logging operations in the forest and would be adversely affected if the court stopped logging.[41] Several companies with existing contracts to cut timber or generated most of their income from existing contracts also moved to intervene.[42] Our Court of Appeals found the two sets of intervenors established a threat to their interests and a reasonable doubt whether the government agency would adequately represent those interests.[43] Our Court of Appeals declined to categorically eliminate economic interests as qualifying interests under Rule 24.[44] Statutory entitlements or existing contractual relations anchored the companies' economic logging interests.[45]

The Local and International Longshoremen Unions also cite several cases where our colleagues allowed unions to intervene.[46] But each of the cited cases involved potential for direct impact on the actual terms of employment and not just the potential for reduced hours.[47] The Unions, unlike the school districts and townships in *Kleissler*, do not have existing contractual relationships or statutory rights impaired by the Army Corps' evaluation of Diamond State's application. The Unions are, at best, derivative beneficiaries of funds they expect Diamond State's Port will generate.

We find the Unions do not present a sufficient interest permitting mandatory intervention under Rule 24(a).[48]

### 3. Even if the Unions presented a sufficient interest, the Unions have not shown their interests are not adequately represented by the existing parties.

We appreciate how the Unions could argue we should extend our Court of Appeals's 1998 analysis in *Kleissler* to allow them to intervene even though they do not enjoy a contractual relationship today and are not the direct recipients of economic benefits from the developed Edgemoor Port. But, even assuming *arguendo* we extended Our Court of Appeals's guidance, we must decline mandatory intervention because the Unions' professed economic interests are fully and adequately protected by Diamond State as the party receiving the direct economic benefit.

The Unions did not show how the Army Corps nor Diamond State could not adequately represent their interests. Our Court of Appeals instructs an intervenor's interests "are not adequately represented if they diverge sufficiently from the interests of the existing party" to the extent "'the existing party cannot devote proper attention to the applicant's interests.'"[49] The burden is minimal.[50] The Unions must show Diamond State's or the Army Corps' representation of its interest may be inadequate.[51] A rebuttable presumption of adequacy applies "if one party is a government entity charged by law with representing the interests of the applicant for intervention."[52] The presumption is particularly strong when the governmental and private interests "closely parallel" one another or are "nearly identical."[53] But "when an agency's views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it, the burden is comparatively light."[54]

Diamond State is already arguing about the benefits of denying the Terminal's relief. Diamond State is the direct economic beneficiary of a permit. It will develop the Edgemoor Port. It is, unlike the Army Corps, directly invested in the economic gains including paying workers in the Unions. The Unions did not make a compelling showing to overcome the adequacy presumption.

The Unions similarly did not make a compelling showing the Army Corps' views are necessarily colored by its view of the public welfare rather than the more narrow views of the Unions. They did not overcome the adequacy presumption.

**B. We deny permissive intervention**.

The Local and International Longshoremen Unions argue in the alternative for permissive intervention under Rule 24(b).[55] The Terminals argue we should not permit the Local and International Longshoremen Unions to intervene because their presence would "add nothing to the material issues in dispute and the Unions' asserted economic and bargaining interests are more than adequately represented by the existing parties."[56]

The Supreme Court through Rule 24(b) permits us, upon a timely motion, to allow anyone to intervene who either: 1) is given a conditional right to intervene by a federal statute; or 2) has a common question of law or fact with the action for a claim or defense.[57]

The Local and International Longshoremen Unions conceded during oral argument we are bound by the administrative record in considering the merits of Terminals' challenge to the Army Corps' review of navigability and safety concerns. The Unions further conceded they did not submit comments and are not part of the administrative record. And so, the Unions are left with wanting to be heard on an issue not before us.

The Unions are not given a conditional right to intervene by Congress. The Unions do not have a common question of law or fact with the action for a claim or defense because their economic interests are not before us. The Terminals do not challenge the Army Corps' consideration of economic impact. The Unions' interests in jobs are not before us in this Action. We appreciate the Unions would like to advise as to how our review of the administrative record may affect jobs. But we are focusing on the Terminals' challenge to the Army Corps' review of

navigability and safety. No one disputes the Army Corps' review of economic considerations. We cannot envision how concerns with union members' hours would affect our analysis of whether the Army Corps properly evaluated navigability and safety. The Unions do not argue – and we cannot see how they credibly could – we should approve the Army Corps' study of navigability and safety issues based on securing more employment for Union members. Distinct issues.

We find no basis for permissive intervention.

## III. Conclusion

We deny the Local and International Longshoremen's Motions to intervene.

---

[1] Water Resources Development Act, Pub. L. No. 102-580, § 101 (6), 106 Stat. 4797 (1992).

[2] 33 U.S.C. § 403 (section 10); 33 U.S.C. § 1344 (section 404).

[3] No. 23-4283, ECF 1.

[4] *Id.*

[5] No. 23-4283, ECF 1 ¶ 9.

[6] No. 23-4283, ECF 44 at 25, 34–48.

[7] *Id.* at 25, 48–51.

[8] *Id.* at 25, 45.

[9] ECF 1 ¶ 43.

[10] *Id.* ¶ 54.

[11] ECF 1.

[12] *Id.* ¶¶ 1, 3

[13] ECF 17.

[14] ECF 18.

[15] ECF 16.

[16] ECF 20.

[17] ECF 36.

[18] ECF 40.

[19] ECF 16-1 at 5–15; ECF 20-1 at 4–11.

[20] ECF 36.

[21] Fed. R. Civ. P. 24(a).

[22] *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela Red Tree Invs., LLC*, No. 23-1117, 2024 WL 3342444, at *3 (3d Cir. July 9, 2024).

[23] *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005).

[24] *See* ECFs 10, 16.

[25] ECF 16-1 at 9–10.

[26] *Id.* at 10.

[27] *Id.* at 10–11.

[28] ECF 20-1 at 6.

[29] *Id.*

[30] *Id.* at 6–7.

[31] ECF 36 at 11.

[32] *Id.* at 11–12.

[33] *Id.* at 12.

[34] *Id.* at 13.

[35] *Transource Pa., LLC v. Dutrieuille*, No. 21-2567, 2022 WL 2236466, at *2 (3d Cir. June 22, 2022).

[36] *Liberty Mut. Ins. Co. v. Treesdale*, 419 F.3d 216, 220 (3d Cir. 2005).

[37] *Id.* at 221 (quoting *Mountain Top Condo. Ass'n. v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, at 366 (3d Cir. 1995)).

[38] *Id.*

[39] 157 F.3d 964 (3d Cir. 1998).

---

[40] *Id.* at 967.

[41] *Id.* at 968.

[42] *Id.*

[43] *Id.*

[44] *Id.* at 968–72.

[45] *Id.* at 972–73.

[46] ECF 16-1 at 7.

[47] *See Allied Concrete and Supply Co. v. Baker*, 904 F.3d 1053, 1066–68 (9th Cir. 2018); *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189–90 (9th Cir. 1998); *EEOC v. AT&T Co.*, 506 F.2d 735, 741–42 (3d Cir. 1974).

[48] We need not opine on whether there is a threat the interest will be impaired or affected by the disposition of the action. Assuming *arguendo* the Unions had a sufficient interest in the issues in the Action before us, the Unions established a threat the interest will be impaired if we again direct the Army Corps to revisit the applications to ensure navigability and safety.

[49] *Commw. of Pa.*, 888 F.3d at 60 (quoting *United States v. Territory of the Virgin Islands*, 748 F.3d 514, 520 (3d Cir. 2014)).

[50] *Commw. of Pa.*, 888 F.3d at 60.

[51] *Id.*

[52] *Id.* (quoting *Virgin Islands*, 748 F.3d at 520).

[53] *Id.* (quoting *Virgin Islands*, 748 F.3d at 525).

[54] *Id.* (quoting *Kleissler*, 157 F.3d at 972).

[55] ECFs 16-1 at 15, 20-1 at 11-12.

[56] ECF 36 at 19.

[57] Fed. R. Civ. P. 24(b).